(Nos. 52654, 52789 cons.—

CERRO COPPER PRODUCTS *et al.,* Appellees, v. THE ILLINOIS COMMERCE COMMISSION *et al.,* Appellants.

*Opinion filed December 1, 1980.—Rehearing*
*denied January 29, 1981.*

William J. Scott, Attorney General, of Springfield (Hercules F. Bolos, Special Assistant Attorney General, and James E. Weging, Assistant Attorney General, of counsel), for appellant Illinois Commerce Commission.

William E. Jaudes, of St. Louis, and Robert Broderick, of Pope & Driemeyer, of Belleville, for appellant Union Electric Co.

Randall Robertson, of Lueders, Robertson & Konzen, of Granite City, and John P. Meyer, of Danville, for appellees.

MR. JUSTICE WARD delivered the opinion of the court:

The Union Electric Company (Union Electric) provides utility service to customers in a three-State area, including service to 69,000 Illinois customers residing in St. Clair, Madison, Jersey and Hancock counties. It filed a proposed schedule of rates with the Illinois Commerce Commission (Commission) which called for an increase in

revenues of $14,389,000, which would have represented a 17.48% overall rate increase. The Commission conducted hearings into the necessity and reasonableness of the requested increase and in the course of the proceedings granted leave to intervene to several industrial corporations, including the Cerro Copper Products Company (Cerro Copper), which are provided service by Union Electric.

On February 8, 1978, the Commission issued an order which allowed $8,986,000 of the requested $14,389,000 revenue increase, and raised the existing level of operating income to $19,155,000. Attached to the order as Appendix A was a schedule of new rates, which Union Electric was directed to implement and which the Commission stated "will enable the Company to earn Illinois electric operating income of about $19,155,000 for a return of about 9.25% on the original cost rate base approved herein ***. Such amount of operating income and rate of return are fair, just and reasonable ***."

Separate petitions for rehearing filed with the Commission by Union Electric and Cerro Copper were denied. Though no new evidence was suggested in its petition, Cerro Copper's petition complained that the rates of residential consumers were being increased by only 8.83%, whereas large commercial and industrial customers serviced under rate 9 and rate 6 were being required to pay an additional 12.55% and 12.56% respectively. Cerro Copper argued that these rates did not reflect the intent underlying the Commission's order, which it claims was to apply the same percentage increase to each service classification of customers. The circuit court of Jersey County, on appeal, rejected Cerro Copper's argument and held that the order was "not against the manifest weight of the evidence" and that the approved rate increase was not a "substantial variance from the intent of the Order." The appellate court, with one judge dissenting, stated that it

affirmed the Commission's order but was setting aside the rates as "inconsistent with the findings of fact contained in the body of the Commission's order." (76 Ill. App. 3d 230, 233.) (It will not be necessary to consider whether the appellate court could properly "affirm" the order and also set aside the rates the Commission had set under it.) The court calculated that the increase of $8,986,000 granted by the Commission represented the overall revenue increase of 10.92% and that each service classification rate should be increased by that percentage. The court remanded to the Commission "for the setting of rates that are consistent with the findings of fact previously made. A mere matter of arithmetic." (76 Ill. App. 3d 230, 233.) We granted the Commission's and Union Electric's petitions for leave to appeal. 73 Ill. 2d R. 315.

Cerro Copper's argument that the Commission's rate schedule is inconsistent with parts of its order, and as a consequence illegal, is founded on several statements of opinion and comments made by the Commission in its order. On page four of the 16-page order these comments appear:

> "As hereinafter stated, the Company is currently engaged in a class cost of service study which is expected to be completed during 1978. Other than the four exceptions previously discussed, [which have no relevance here,] it was suggested by the Company, and the Commission is of the opinion, that it would be appropriate to maintain existing class-revenue relationships until such time as the results of the study would be available to the Company and this Commission for a more definitive adjustment if warranted by the results of study.
>
> ***
>
> The Commission is of the opinion that any increase in Illinois electric operating revenues allowed by this Order should be assigned to the various service classifications utilizing approximately the same percentage increase including customers served under Service Classifications 6 and 9, except for the four exceptions previously alluded to.
>
> ***

> This Commission is aware, and the record in this case indicates, that the Company is currently engaged in the completion of a detailed class cost of service study which would indicate in a more definitive way the relationship of present costs to the rates applicable to various classifications of service. The cost of service study will not be available until after an Order must be entered by this Commission under the provisions of Section 36 of the Public Utilities Act. Necessarily therefore, the results of such study will not be available to this Commission and for that reason the Commission is of the opinion that it is not appropriate to make any major adjustment in the existing class-revenue relationships of the various service classifications but rather is appropriate to substantially maintain the existing relationships.

As stated, the percentage increases that Cerro Copper complains were set for commercial and industrial consumers under rates 9 and 6 were 12.55% and 12.56%, respectively, while an 8.83% increase was scheduled for residential users. Though not challenging the order itself, Cerro Copper states that the difference in the rate increases allowed by the Commission under the new rate schedule is in conflict with the cited language in the Commission's order.

Under the provisions of the Public Utilities Act (Ill. Rev. Stat. 1979, ch. 111 2/3, par. 1 *et seq.*) the Commission is empowered "to ascertain the value of [a public utility's] property" (Ill. Rev. Stat. 1979, ch. 111 2/3, par. 30). Upon its determination under the "fair value" method (*Union Electric Co. v. Illinois Commerce Com.* (1979), 77 Ill. 2d 364) the utility is entitled to receive a "reasonable return on the value of [its] property." (Ill. Rev. Stat. 1979, ch. 111 2/3, par. 36.) When the Commission issues an order, section 65 of the Act requires that it "make and render findings concerning the subject-matter and facts inquired into and enter its order based thereon" (Ill. Rev. Stat. 1979, ch. 111 2/3, par. 69). The purpose of announcing findings of fact, which must be

based upon evidence contained in the record (*Atchison, Topeka & Santa Fe Ry. Co. v. Commerce Com. ex rel. Illinois Coal Traffic Bureau* (1929), 335 Ill. 624), is to enable a court to make an intelligent review of the decision. (*City of St. Charles v. Illinois Commerce Com.* (1961), 21 Ill. 2d 259; *Brinker Trucking Co. v. Illinois Commerce Com.* (1960), 19 Ill. 2d 354; *Illinois Bell Telephone Co. v. Illinois Commerce Com.* (1979), 67 Ill. App. 3d 616.) Where the Commission fails to set out findings supporting its decision, or if the findings are not based upon evidence in the record, the order is to be set aside. *Wabash R.R. Co. v. Order of Ry. Conductors of America* (1949), 402 Ill. 548; *Rockwell Lime Co. v. Commerce Com.* (1940), 373 Ill. 309.

One reason for requiring specificity in the finding of facts is that reviewing courts are not permitted to conduct a *de novo* review (*Village of Apple River v. Illinois Commerce Com.* (1960), 18 Ill. 2d 518) and are empowered only to consider whether the Commission has acted within the scope of its authority, whether any constitutional right has been infringed, and whether its findings are founded on the evidence (*Killarney Water Co. v. Illinois Commerce Com.* (1967), 37 Ill. 2d 345; *Champaign County Telephone Co. v. Illinois Commerce Com.* (1967), 37 Ill. 2d 312). An order of the Commission will be presumed to be valid (*Village of Maywood v. Illinois Commerce Com.* (1961), 23 Ill. 2d 447, cert. denied (1962), 369 U.S. 851, 8 L. Ed. 2d 10, 82 S. Ct. 935) and may not be set aside unless it is clearly contrary to the manifest weight of the evidence (Ill. Rev. Stat. 1979, ch. 111 2/3, par. 72; *McMann v. Illinois Commerce Com.* (1967), 38 Ill. 2d 126; *Village of Apple River v. Illinois Commerce Com.* (1960), 18 Ill. 2d 518). In the area of setting utility rates courts have generally deferred to the Commission's expertise. (*Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Com.* (1960), 19 Ill. 2d 436; *Brinker Trucking Co. v.*

*Illinois Commerce Com.* (1960), 19 Ill. 2d 354.) Illustrative of this was the comment in *Village of Milford v. Illinois Commerce Com.* (1960), 20 Ill. 2d 556, 561:

> "The limits of judicial review in public utility rate cases, as well as the reasons for such limits, have been fixed by many decisions of this court and we see no useful purpose in unduly extending this opinion by repeating them here. Suffice it to say we have recognized that the determination of rates is not a matter of formulas but one of sound business judgment which has been committed by the legislature to the expert judgment of the Commission and, in deference to the judgment of the Commission, we have consistently held that its orders in such respect will not be disturbed unless the findings upon which they are based are arbitrary or against the manifest weight of the evidence, or unless in contravention of some established rule of law or constitutional right."

See also *Island Lake Water Co. v. Illinois Commerce Com.* (1978), 65 Ill. App. 3d 853; *Monarch Gas Co. v. Illinois Commerce Com.* (1977), 51 Ill. App. 3d 892. See generally Kucera, *Dismissal of Actions Before the Illinois Commerce Commission,* 2 J. Mar. J. Prac. & Proc. 92 (1968).

The fundamental purpose of providing a particular rate schedule is to generate a rate of return which the Commission has approved as just and reasonable and which will enable the utility to continue operation at an acceptable level of operating income. Many and complex factors must be considered. The fair value of the utility's property, the existing capital-formation structure, the proposed financing for any construction programs, original cost rate base, operating expenses, revenue and income, and the cost of providing electrical service to the various classifications of consumers must be examined before the

Commission issues an order and announces a schedule of rates.

Here, it was the Commission's analysis of these factors which led to its findings of fact and the schedule of rates announced, which the Commission calculated would generate an acceptable operating income of $19,155,000. The Commission specifically found that the "rates approved by this Order are reasonably justified by the record in this case."

We consider that the circuit court was correct in rejecting Cerro Copper's argument and in holding that the Commission's order was not contrary to the manifest weight of the evidence. Neither Cerro Copper nor the appellate court was critical of the Commission's decision allowing Union Electric a revenue increase of $8,986,000, which would raise the utility's operating income level to $19,155,000, for a return of 9.25% on Union Electric's cost rate base. The appellate court erred when it set aside the rates established by the order and directed the Commission to increase the rates uniformly for all of Union Electric's 69,000 Illinois customers by 10.92%.

The Commission did not order rates increased by 10.92%. Rather it granted Union Electric the right to additional operating revenues of $8,986,000 and set rates for the Illinois customers which would produce additional revenues in that amount. The appellate court, in following the argument of Cerro Copper, calculated that the $8,986,000 in additional revenues represented a 10.92% increase and that the rates in each service classification should therefore be increased by this percentage. This was oversimplification and error. The rates set by the Commission were not based upon percentage increases but rather reflected changes in the allowable rates per kilowatt hour and in minimal monthly charges. To impose a flat percentage increase on existing rates would be to apply a simplistic formula to a complex economic study, the

purpose of which is to generate an acceptable operating income to insure a utility a reasonable return on the value of its property. In this case the acceptable operating income was determined by the Commission to be $19,155,000. No attempt has been made by Cerro Copper to show that the imposing of the straight increase to each rate would generate for Union Electric the amount of revenue that the Commission has determined that it requires. Nor is there any attempted calculation to show how much revenue Union Electric would receive through a straight percentage increase as the appellate court ordered. The Commission's establishment of the rates represented a part of its findings of fact which will not be set aside unless shown to be contrary to the manifest weight of the evidence. This has not been done.

We have cited above language in the Commission's order which sets out the opinion of the Commission that it was appropriate to maintain "existing class-revenue relationships and not make 'any major adjustment in them.' " This language can be given more than one interpretation. Cerro Copper argues that the variations in the rate classification increases are violative of this language. The Commission, however, argues that "the existing class revenue relationships" under its interpretation would be undisturbed. It notes that the residential classification of Union Electric's service under the old rate provided 24.6% of Union Electric's total customer sales revenues and under the new rate it would be 24.2%. Under the old rate the large commercial and industrial users classification provided 43.3% of the revenue support of the utility, whereas under the new rate it would provide 43.7%.

In any event, we would observe that the comments, as to not making "any major adjustment in the existing class-revenue relationships" and as to "assigning service classifications approximately the same percentage

increase," were explicitly statements of opinion by the Commission. We consider they were not intended by the Commission to set inflexible limits on the action that the Commission might be required to order in the public interest. They might be regarded as expressions of the Commission's aspiration or goal.

There having been no showing that the Commission's order was contrary to the manifest weight of the evidence, we reverse that part of the appellate court's judgment which remanded the cause to the Commission with directions. Under the disposition we make it is not necessary for us to consider the additional arguments that the appellate court improperly usurped a legislative power in ordering the Commission to impose particular rates and that it violated the provisions of section 68 of the Public Utilities Act (Ill. Rev. Stat. 1979, ch. 111 2/3, par. 72), under which there are only limited judicial powers of review. That part of the appellate court's judgment which affirmed the Commission's order is affirmed. The judgment of the circuit court of Jersey County is affirmed.

*Appellate court affirmed in part and reversed in part; circuit court affirmed.*