RESOURCE TECHNOLOGY CORPORATION, Petitioner-Appellant, v. COMMONWEALTH EDISON COMPANY *et al.*, Respondents-Appellees.

First District (3rd Division) No. 1—02—2732

Opinion filed August 6, 2003.

Chuhak & Tecson, P.C., of Chicago (Alan R. Dolinko, Gary J. Stern, and Tracy E. Stevenson, of counsel), for appellant.

Paul F. Hanzlik and John L. Rogers, both of Foley & Lardner, and Anastasia M. Polek, of Exelon Business Services Company, both of Chicago, for appellee Commonwealth Edison Company.

John P. Kelliher and David L. Nixon, Special Assistant Attorneys General, of Chicago, for appellee Illinois Commerce Commission.

JUSTICE WOLFSON delivered the opinion of the court:

Resource Technology Corporation (RTC) is in the business of collecting methane gas generated by landfills and converting the gas into usable energy. In 1997, the Illinois Commerce Commission (Commission) determined that 15 of RTC's facilities, including one in Pontiac, Illinois, qualified as "qualified solid waste energy facilities" (QSWEFs) under the Illinois retail rate law. As a result, Commonwealth Edison (ComEd) was required to purchase electricity from RTC at a favorable retail rate. In 2002, ComEd requested a declaratory ruling from the Commission, asking for a determination that it was not required to pay the retail rate for electricity at the Pontiac facility beyond the "configured capacity" of 10 megawatts (MW). The Commission entered a declaratory ruling in ComEd's favor. RTC now appeals. We reverse the Commission's order.

## FACTS

On January 9, 1997, RTC filed verified petitions with the Commission, seeking qualification of 15 proposed landfill-methane-gas-to-electric facilities as QSWEFs under the retail rate law. The section of the Illinois Public Utilities Act commonly referred to as the "Retail Rate Law" was enacted in 1987 to encourage the development of alternate energy production facilities in order to conserve energy resources and provide for their most efficient use. 220 ILCS 5/8—403.1 (West 2000) (hereafter Retail Rate Law). The Retail Rate Law is administered solely by the Commission. Under the law, if a company is

qualified by the Commission as a QSWEF, it is entitled to a long-term contract of at least 10 years with an electric utility company. The utility company must purchase electricity from the QSWEF at a favorable "retail rate," equal to the average cost per kilowatt hour paid from time to time by the unit of local government in which the electricity generating facilities are located. 220 ILCS 5/8—403.1(c) (West 2000).

The "retail rate" is substantially higher than the wholesale rate the utilities would otherwise pay for electricity bought from private generators of electricity. *CGE Ford Heights, L.L.C. v. Miller*, 306 Ill. App. 3d 431, 433, 714 N.E.2d 35 (1999). The utility receives tax credits from the state in an amount equal to the difference between the "retail rate" paid to the QSWEF and the "avoided cost" were the utility to generate such electricity itself. The QSWEF must reimburse the state for the value of the issued tax credits after retirement of the debt incurred to finance its construction. 220 ILCS 5/8—403.1(d) (West 2000).

On October 8, 1997, the Commission issued an order determining that all 15 of RTC's proposed facilities were qualified as QSWEFs, with "a total gross generating capacity of 65 megawatts located in fifteen Illinois locations." In the summary of evidence portion of the order, the Pontiac facility was described as: "Docket 97—0034 landfill, located at 14732 East 2100 North Road, Pontiac, Illinois, will have a capacity of 10 MW, with a projected commercial operation date in the 1st quarter of 1998. The facility is located in ComEd's service territory."

According to RTC, shortly after the 1997 order it began constructing and activating the proposed facilities. Among the capital costs incurred at the Pontiac facility, RTC expended in excess of $700,000 in the construction of an "interconnect" tying the electric plant to ComEd's electrical transmission grid. The effect of the interconnect was to enable RTC to exceed 10 MW of electrical production capacity at the Pontiac facility. RTC says ComEd consented to the construction of this interconnect.

In November 1999, RTC filed for bankruptcy under chapter 7 of the Bankruptcy Code (11 U.S.C. § 701 *et seq.* (1994)) in the United States Bankruptcy Court for the Northern District of Illinois. The bankruptcy case was converted to chapter 11 (11 U.S.C. § 1101 *et seq.* (1994)) in February 2000 and still is going on.

On October 6, 2000, RTC and ComEd executed a "Rate 18 Standby Electric Service Contract," under which ComEd was to pay RTC "Rider 3 retail rates" in accord with the requirements imposed by the Retail Rate Law. ComEd purchases electricity from generating facilities under two Commission-approved rates: rider 4, which applies to

any customer operating an electric production facility, and rider 3, which applies only if the facility is qualified by the Commission as a QSWEF. In December 2000, the 10-year period during which ComEd was to pay the rider 3 retail rate began. The initial phase of construction of the Pontiac facility was completed in March 2001.

On June 14, 2002, ComEd sent a letter to RTC, informing RTC that it would no longer pay the rider 3 retail rate for its purchase of electricity in excess of 10 MW. In the letter, ComEd said the Commission's QSWEF determination applied to RTC's Pontiac facility "as configured" at the time of the order, which referenced a 10 MW capacity for that location.

ComEd said it had sent a letter to the Pontiac facility requesting information regarding its compliance with the QSWEF regulatory obligations. In response to its inquiry, ComEd received a copy of RTC's "application for re-self certification under FERC Commission Regulation No. 292—207," dated June 10, 2002. According to RTC's Federal Energy Regulatory Commission (FERC) Form 556, "[t]he maximum gross electric power production capacity of the facility on a stand alone basis is 35,000 kilowatts [35 MW] based on actual capacity of the generators at the site." ComEd stated in the letter to RTC that it would utilize the 10 MW value to determine the amount of electricity eligible for rider 3 pricing until such time as it received clarification of the Pontiac facility's QSWEF status for up to 35 MW. The remaining capacity in excess of 10 MW would be reimbursed under rider 4, at a lower rate than required by rider 3.

RTC then filed an emergency petition seeking a temporary and preliminary injunction against ComEd in bankruptcy court. The bankruptcy court issued a temporary restraining order on July 3, 2002, requiring ComEd to compensate RTC for all electricity provided to it from the plant on or before July 12, 2002, at rider 3 retail rates. The order further provided:

"To the extent necessary, the automatic stay is hereby modified to permit Edison or RTC to file pleadings with, and otherwise proceed before, the ICC. Either Edison or RTC may request that the ICC interpret its [1997 order], in which the ICC granted QSWEF status to the Plant, as configured in RTC's petition. Either Edison or RTC may also request that the ICC determine the existence and extent of the Plant's present QSWEF status and RTC's entitlement to be compensated for all electricity produced at the Plant at Rider 3 rates."

On July 5, 2002, ComEd filed its verified emergency petition for declaratory ruling and accompanying motion with the Commission. In the petition, ComEd requested that the Commission issue a declara-

tory ruling "determining ComEd's obligations under the provisions of the Public Utilities Act, including 220 ILCS 5/9—102, 103, 104, 201, 240, and 241," to pay the retail rate for purchases of energy from the Pontiac facility in excess of that facility's 10 MW configured capacity specified in the 1997 order, or for such other relief as the Commission deemed appropriate. ComEd was seeking relief on an emergency basis so that the Commission's determination would be available to the bankruptcy court at a preliminary injunction hearing scheduled for July 9, 2002.

On July 9, 2002, the bankruptcy court granted a preliminary injunction to RTC, reaffirming the lift of the automatic stay to allow the parties to "file pleadings with, and otherwise proceed before, the ICC to determine the existence and extent of the Plant's QSWEF certification."

On July 15, 2002, the Commission staff filed a response to ComEd's emergency petition. In the response, the staff contended that the 1997 order, read in light of the testimony of George Calvert, RTC president, supported the conclusion that the Pontiac facility's output was configured at 10 MW. ComEd's obligation thus was limited to the purchase at the retail rate of 10 MW. The staff supported the entry of an order by the Commission to that effect. The staff also recommended that the Commission act on the petition as quickly as possible to provide guidance to the bankruptcy court and suggested an expedited briefing schedule.

On July 16, 2002, the Commission granted the staff's request to approve the following schedule: receipt deadline of July 19, 2002, for responses to ComEd's petition; and receipt deadline of July 22, 2002, for replies to any responses.

On July 18, 2002, RTC filed a response in opposition to ComEd's petition and the Commission staff's response, including objections to the expedited schedule. RTC also filed an appearance. The Commission later allowed petitions to intervene in the proceeding filed by RTC and three of RTC's creditors—Banco Panamericano, Inc., Chiplease, Inc., and Leon Greenblatt.

Following the filing of replies by ComEd and the staff, the Commission hearing officer issued a proposed order on July 29, 2002. On September 4, 2002, the Commission issued its order, finding ComEd was not obligated to pay the rider 3 retail rate for energy generated at the Pontiac facility in excess of 10 MW. RTC moved for a rehearing and an emergency stay, which were denied on September 11, 2002. On September 13, 2002, RTC filed this appeal.

On October 7, 2002, the Commission filed a motion to dismiss the appeal. The Commission contended the September 4, 2002, order is

not appealable because it is a declaratory ruling under section 200.220 of the Commission's rules of practice. 83 Ill. Adm. Code § 200.220 (2000). Section 200.220 provides that declaratory rulings are not appealable. ComEd filed a response in support of the motion. RTC filed a response opposing the motion, contending the order was not a declaratory action within the meaning of section 200.220 and thus is appealable.

## DECISION

### I. Jurisdiction

█ The first issue we must address is whether to grant the Commission's motion to dismiss. The Commission and ComEd contend we do not have jurisdiction to decide this appeal, citing section 5—150(a) of the Illinois Administrative Procedure Act (5 ILCS 100/5—150(a) (West 2000)), and Rule 200.220(i) of the Commission's rules of practice. Under both sections, declaratory rulings are not appealable. 5 ILCS 100/5—150(a) (West 2000); 83 Ill. Adm. Code § 200.220(i) (2000).

Section 5—150(a) of the Administrative Procedure Act provides:
> "Requests for rulings. Each agency may in its discretion provide by rule for the filing and prompt disposition of petitions or requests for declaratory rulings as to the applicability to the person presenting the petition or request of any statutory provision enforced by the agency or of any rule of the agency. Declaratory rulings shall not be appealable." 5 ILCS 100/5—150(a) (West 2000).

Rule 200.220 of the rules of practice for the Commission provides:
> "a) When requested by the affected person, the Commission may in its sole discretion issue a declaratory ruling with respect to:
>> 1) the applicability of any statutory provision enforced by the Commission or of any Commission rule to the person(s) requesting a declaratory ruling; and
>> 2) whether the person's compliance with a federal rule will be accepted as compliance with a similar Commission rule.

> \* \* \*

> i) Declaratory rulings shall not be appealable." 83 Ill. Adm. Code §§ 200.220(a), (i) (2000).

We find subsection(a)(1) is a separate subsection under which an affected person may request a declaratory ruling. There is no requirement that both subsections (a)(1) and (a)(2) be satisfied in order to request a declaratory ruling.

The question is whether the Commission's action was a proper "declaratory ruling" under section 200.220(a)(1). The answer to this question will determine whether we have jurisdiction to reach the merits of this appeal.

■ There are certain instances where agency decisions are unreviewable exercises of discretion. See *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 498-99, 524 N.E.2d 561 (1988). In *Greer*, one of the issues was whether appellate review was precluded by language in the Illinois Housing Development Act (Ill. Rev. Stat. 1985, ch. 67½, par. 301 *et seq.*) committing decisions about the composition of projects to the discretion of the Illinois Housing Development Authority. The court held that most agency actions are presumed reviewable in the absence of some express statutory prohibition of review, or at least in the absence of language committing the decision to unreviewable agency discretion. *Greer*, 122 Ill. 2d at 497. Whether, and to what extent, a relevant statute precludes judicial review is determined by its express language, the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved. *Greer*, 122 Ill. 2d at 497-98, citing *Block v. Community Nutrition Institute*, 467 U.S. 340, 345, 81 L. Ed. 2d 270, 275-76, 104 S. Ct. 2450, 2454 (1984). Of particular importance is whether the statute contains standards, goals, or criteria by which a court may evaluate agency action. *Greer*, 122 Ill. 2d at 498. See also *Hanrahan v. Williams*, 174 Ill. 2d 268, 276, 673 N.E.2d 251 (1996) (Prisoner Review Board's (Board) denial of parole is not a reviewable order because statutory criteria and Board rules are not objective enough to allow a court to evaluate the Board's decision).

In this case, the Commission contends its decision fits within its Rule 200.220 definition of declaratory ruling and that there are no standards this court can use to review the order. ComEd joins forces with the Commission on this issue, contending its petition sought to determine the applicability to it of various statutory provisions enforced by the Commission. ComEd contends its sole purpose is to apply its rates properly and without preference or discrimination, as required by the Public Utilities Act. See 220 ILCS 5/9—102, 9—103, 9—104, 9—201, 9—240, 9—241 (West 2000).

Our review of Illinois decisions and Commission actions does not offer much guidance on the kinds of issues that are appropriate subjects for a declaratory ruling. Before Rule 200.220 was promulgated by the Commission in 1996, two appellate decisions held the Commission had no authority to render declaratory rulings. An order directing a telephone company to comply with Commission rules in projects not yet undertaken was held to be an impermissible declaratory ruling in *Harrisonville Telephone Co. v. Illinois Commerce Comm'n*, 176 Ill. App. 3d 389, 393, 531 N.E.2d 43 (1988). And the Commission was held to have been correct when it refused to decide whether it had jurisdiction over a contract between a municipal electric agency and the City

of Highland. *Illinois Municipal Electric Agency v. Illinois Commerce Comm'n*, 247 Ill. App. 3d 857, 862, 617 N.E.2d 1363 (1993).

The Commission declined to issue a Rule 200.220 declaratory ruling in *Illinois Industrial Energy Consumers' Request for Declaratory Ruling pursuant to 200.220 re: Section 16—102 of an Act Entitled "Electric Service Customer Choice and Rate Relief Law of 1997,"* Ill. Com. Comm'n No. 98—0607 (March 10, 1999). The Commission was asked to clarify the meaning of a provision of the Public Utilities Act. The Commission said it has "no authority to declare what a particular statute means in some abstract sense."

■ We decline to give Rule 200.220 the broad meaning suggested by the Commission and ComEd. An administrative agency derives its power to act solely from the statute by which it was created, although the agency charged with enforcing a statute is given "inherent authority and wide latitude to adopt regulations or policies reasonably necessary to perform the agency's statutory duty." *Chemed Corp. v. State*, 186 Ill. App. 3d 402, 410, 542 N.E.2d 492 (1989).

Just about everything the Commission does involves, in one way or the other, applicability of provisions of the Public Utilities Act. Taking that observation a step further, one could argue for a declaratory ruling each time the Commission makes a decision concerning the Public Utilities Act. The argument goes too far. The exception swallows the rule. Instead, we examine the substance of ComEd's petition.

■ The bankruptcy court authorized ComEd and/or RTC to ask the Commission to interpret its 1997 order and to determine whether RTC was entitled to be paid at rider 3 rates for all of its output at Pontiac, or whether a maximum of 10 MW applies to rider 3. That is what ComEd did, although its petition was dressed up in language that sought the Commission's view of statutory application. The "affected person" was not ComEd, but RTC, which stands to lose a substantial amount of revenue if ComEd is not required to pay the favorable retail rate for energy output at Pontiac in excess of 10 MW.

We do not have to be experts in alternative energy production or energy rate calculations to decide this case. We are empowered to consider whether the Commission has acted within the scope of its authority, whether any constitutional right has been infringed, and whether the Commission's findings are founded on the evidence. *Cerro Copper Products v. Illinois Commerce Comm'n*, 83 Ill. 2d 364, 370, 415 N.E.2d 345 (1980).

We conclude the Commission's September 4, 2002, order was not a declaratory ruling within the meaning of Rule 200.220. For that reason, we deny the Commission's motion to dismiss this appeal.

The question now becomes whether we can proceed to the merits

of this appeal, or, having said the wrong procedure was used, do we have to send the case back for a different kind of hearing?

RTC participated in the Commission proceedings. It filed a response to ComEd's petition. It received permission to intervene. When an administrative law judge issued a proposed order, RTC filed a brief and exceptions to it. Once the Commission entered its order RTC moved for a rehearing and an emergency stay. In its emergency motion requesting oral argument at the Commission, RTC conceded that "[t]he matter has been fully briefed, a proposed order has been tendered, and Briefs and Exceptions have been filed. Further, various parties have intervened in the matter."

We see no need for a fact hearing by the Commission. At stake are matters of law, which require *de novo* review. During oral argument in this court RTC agreed nothing more would be gained by a traditional fact hearing, with the possible exception of an opportunity to present its argument that the Commission and ComEd are estopped from imposing limits on energy output at Pontiac. We have examined RTC's estoppel argument and find no merit to it.

Therefore, although the Commission improperly conducted a declaratory ruling proceeding, there is no barrier to moving on to the merits of RTC's appeal.

## II. Output Limits at Pontiac

■ Whether the Commission has been granted inherent or implied authority to impose maximum output levels at a qualified QSWEF is a serious question we need not decide. We do not read the 1997 order as imposing a maximum output level at the Pontiac facility. Taking the 1997 order as evidence in this case, we find it does not support the 2002 order appealed by RTC. See *Brinker Trucking Co. v. Illinois Commerce Comm'n*, 19 Ill. 2d 354, 357, 166 N.E.2d 18 (1960) (facts found by the Commission must afford a reasonable basis for the order entered).

The 1997 order was the result of RTC's request that 15 of its landfill sites, including the site at Pontiac, be qualified as QSWEFs as defined in section 8—403.1 of the Public Utilities Act. 220 ILCS 5/8—403.1 (West 2000). During a hearing on RTC's petition, its then-president, George Calvert, testified to the approximate megawatt capacity for each of the 15 facilities under consideration but not yet built. The total capacity, he said, was 65 MW.

The Commission, in its findings portion of the 1997 order, obviously relied on Calvert's testimony:

> "(4) the evidence indicates that the electric generating facilities will be configured to have a maximum gross generating capacity of

46

approximately 65 MWs, they will be owned and operated by RTC; the facilities will use methane generated from the landfill and possess characteristics which enable them to qualify as a small power production facilities under PURPA";

and:

"(5) under the facts set forth in Finding (4), the facilities as configured in the petition, will be qualified solid waste energy facilities pursuant to Section 8—403.1(b) of the Act."

Findings (4) and (5) are in the plural. They refer to total gross capacity and total configuration of facilities. There is no reference to any specific facility. Nor is there any suggestion that a particular facility's output would be limited to the approximate capacity referred to in Calvert's testimony.

Findings (4) and (5) form the basis for the ordering paragraph that the Commission contends sets specific output limits:

"IT IS THEREFORE ORDERED that the electric generating facilities as configured with a *total gross generating capacity of 65 megawatts* located in fifteen Illinois locations, which will be owned by Resource Technology Corporation and fueled by landfill methane and which will be located at the aforementioned landfills[,] are determined to be qualified solid waste energy facilities pursuant to Section 8—403.1(b) of the Public Utilities Act." (Emphasis added.)

We read the ordering paragraph as describing a total output for the 15 facilities. Neither Pontiac nor any other specific facility is referred to in any of the ordering paragraphs. The ordering paragraphs contain no suggestion that the output at any specific facility would be limited. In addition, contrary to the reference in finding 5, RTC's petition did not contain any suggested capacity limits.

We know the Commission knew how to impose a maximum output for a specific QSWEF site. On the same day the RTC order was issued, the Commission issued an order in *Avon Energy Partners, L.L.C.*, Ill. Com. Comm'n Nos. 97—0073, 97—0074, 97—0075 cons. (October 8, 1997). That order repeatedly referred to "maximum gross capacity" at each of three specific landfill sites. At one point it said: "Each contract shall be for the purchase of electricity generated up to the maximum power production capability for each facility as found in this Order." The ordering paragraph contained the "maximum gross generating capacity" for each of the three sites. There was no attempt to compute the total capacity for the combined sites.

The word "maximum" appears nowhere in the ordering paragraphs in the 1997 RTC order. Nor is there any attempt in them to place a maximum limit on the amount of power that would be contained in the contract with the purchaser of power.

Estimating the total megawatt capacity of the 15 landfill sites does serve a purpose—to satisfy the requirement of section 8—403.1(e) (220 ILCS 5/8—403.1(e) (West 2000)), which provides the Commission cannot require an electric utility to buy electricity from a QSWEF that is owned or operated by an entity primarily engaged in the business of producing or selling electricity, gas, or other useful thermal energy from some source other than a QSWEF. In fact, the "primarily engaged" finding was made in the 1997 order that qualified the RTC sites as QSWEFs, triggering the requirement that ComEd contract with RTC for the purchase of power.

Nothing in this record indicates RTC's 15 landfill sites now exceed 65 MW in output. Further, as indicated by a July 18, 2002, affidavit of the current RTC president, John Connolly, the aggregate capacity output involving the ComEd service territory is about 30 MW, lower than the estimated 39 MW anticipated in the 1997 order. The current net capacity at Pontiac is 19 MW.

## CONCLUSION

We conclude the Commission's order that ComEd is not obligated to pay the rider 3 retail rate for energy generated at RTC's Pontiac facility in excess of 10 MW is not supported by the record. We reverse the order.

Reversed.

HALL, J., concurs.

JUSTICE HOFFMAN, specially concurring:

I agree with the majority that we have jurisdiction to entertain this appeal. The Commission's ruling of September 4, 2002, which is the subject of this appeal is not a declaratory ruling as defined in either section 5—150(a) of the Illinois Administrative Procedure Act (5 ILCS 100/5—150(a) (West 2000)) or Rule 200.220(a) of the rules of practice for the Commission (83 Ill. Adm. Code § 200.220(a) (2000)). The ruling is nothing more than an interpretation of the Commission's order of October 8, 1997, which determined that RTC's Pontiac facility is a "qualified solid waste energy facility" (QSWEF) and required various electric utilities, including ComEd, to purchase electric energy from the facility for a period of 10 years. I also agree with the majority's analysis and conclusion that the October 8, 1997, order did not place any limit on the amount of energy that ComEd was required to purchase at a "Rider 3 retail rate" from RTC's Pontiac facility and, as a consequence, the Commission's ruling of

September 4, 2002, must be reversed. I write separately because, unlike my colleagues, I believe that we should address the issue of whether the Commission has the authority to impose maximum output levels for QSWEF"s.

As declared in section 8—403.1 of the Public Utilities Act, the policy of the State of Illinois is to "encourage the development of alternate energy production facilities in order to conserve our energy resources and to provide for their most efficient use." 220 ILCS 5/8—403.1 (West 2002). The Commission is charged with the responsibility of determining whether a facility is a QSWEF. Section 8—403.1(c) provides that the Commission "*shall* require electric utilities to enter into long-term contracts to purchase electricity from qualified solid waste energy facilities [QSWEFs] located in the electric utility's service area, for a period beginning on the date that the facility begins generating electricity and having a duration of not less than 10 years in the case of facilities fueled by landfill-generated methane." (Emphasis added.) 220 ILCS 5/8—403.1(c) (West 2002). That same section of the statute provides a formula for computing the rate per kilowatt hour to be paid by the utilities to a QSWEF. 220 ILCS 5/8—403.1(c) (West 2002).

A plain reading of the statute reveals that, once the Commission has determined that a facility is a QSWEF, it must require electric utilities in whose service area the QSWEF is located to enter into long-term contracts to purchase electricity from the QSWEF. The statute says nothing about the Commission being able to limit the amount of electricity that a utility is required to purchase from such a facility at the rate prescribed in section 8—403.1(c), unless "such purchase would result in estimated tax credits that exceed, on a monthly basis, the utility's estimated obligation to remit to the State taxes it has collected under the Electricity Excise Tax Law [(35 ILCS 640/2—1 *et seq.* (West 2002))]." 220 ILCS 5/8—403.1(d) (West 2002).

The powers of an administrative officer or agency are purely statutory, and they only have the powers given to them by statute. See *Lake County Board of Review v. Property Tax Appeal Board*, 119 Ill. 2d 419, 427, 519 N.E.2d 459 (1988). Any action by an administrative agency that exceeds its authority is void. *Chemed Corp. v. State of Illinois*, 186 Ill. App. 3d 402, 410, 542 N.E.2d 492 (1989). Administrative agencies have the inherent authority to adopt regulations and policies reasonably necessary to enable them to perform their statutory duties. *Lake County Board of Review*, 119 Ill. 2d at 428. However, they may not promulgate rules or policies that are inconsistent with the provisions of a statute they are charged with enforcing. *Harton v. City of Chicago Department of Public Works*, 301 Ill. App. 3d 378, 391, 703 N.E.2d 493 (1998).

The stated policy of this state is to maximize the production and use of alternate sources of energy and to require utilities to purchase electricity from QSWEF's. I believe that any attempt by the Commission to limit the amount of electricity that a utility company is required to purchase from a QSWEF located within its service area, except as specifically provided by statute, is wholly inconsistent with the provisions of section 8—403.1 of the Public Utilities Act and the public policy declared therein. I would hold that any such attempt by the Commission, except as specifically authorized by statute, exceeds its authority and is, therefore, void.