Second Division December 28, 2004 

No. 1-04-0188 

RESOURCE TECHNOLOGY CORPORATION, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County 

)

v. ) No. 02 CH 18158 

)  ILLINOIS COMMERCE COMMISSION,     ) Honorable 

 ) Aaron Jaffe

Defendant-Appellee. ) Judge Presiding.

JUSTICE HALL delivered the opinion of the court:

Resource Technology Corporation (RTC) is a Delaware corporation that presently owns and operates approximately 15 electric generating facilities in Illinois, including the facility located at 14732 East 2100 North Road, Pontiac, Illinois (Pontiac Facility).  All of the electric generating facilities, including the Pontiac Facility, are primarily fueled by landfill-generated methane gas.

RTC appeals from the judgment of the trial court granting the Illinois Commerce Commission's (Commission) motion to dismiss RTC's complaint for declaratory and injunctive relief and denying RTC's motion for summary judgment on its request for the declaratory ruling.

On appeal, RTC contends that: (1) the Commission's proposed review of the Pontiac Facility's status as a "qualified solid waste energy facility" (QSWEF) pursuant to section 8-403.1(b) of the Illinois Public Utilities Act, commonly referred to as the "Retail Rate Law" (220 ILCS 5/8-403.1(b) (West 2000)), is preempted by the Public Utility Regulatory Policies Act of 1978 (PURPA) (16 U.S.C. § 824a-3 (2000)); (2) a facility's status as a QSWEF under state law is automatically established when the facility files a Federal Energy Regulatory Commission (FERC) certification as a "qualified facility" (QF) pursuant to PURPA or a notice of application for such certification; and (3) the trial court erred by relying on the statutory phrase "possesses characteristics," contained in section 8-403.1(b) of the Retail Rate Law, in finding that the Commission possessed the authority to reevaluate the Pontiac Facility's fuel usage rate as it related to the facility's status as a QSWEF.  For the reasons that follow, we affirm.    

BACKGROUND

On July 1, 1996, all of RTC's then proposed facilities, including the Pontiac Facility, were certified as a QF pursuant to PURPA.
(footnote: 1)Thereafter, in early 1997, RTC filed verified petitions with the Commission requesting that the proposed facilities, including the Pontiac Facility, be certified under state law as QSWEFs pursuant to section 8-403.1(b) of the Retail Rate Law (220 ILCS 5/8-403.1(b) (West 2000)).
(footnote: 2) See 
Resource Technology Corp.
, Ill. Comm. Comm'n Nos. 97-0031 to 97-0045 (cons.) (October 8, 1997).  On October 8, 1997, the Commission determined that each of the proposed facilities met the requirements of a QSWEF under the Retail Rate Law, thereby entitling the facilities to receive a "retail rate." See 
Resource Technology Corp. v. Commonwealth Edison Co.
, 343 Ill. App. 3d 36, 38-40, 795 N.E.2d 936 (2003).

On July 10, 2002, the Commission issued a citation order to initiate proceedings against RTC to determine whether the Pontiac Facility continued to meet the criteria necessary to remain a QSWEF. 
Illinois Commerce Comm'n v. Resource Technology Corp.
, Ill. Comm. Comm'n No. 02-0461 (July 10, 2002).  The citation order was prompted by a Commission staff report alleging that the Pontiac Facility no longer qualified as a QSWEF because of three violations: it was operating over its configured capacity of 10 megawatts; it was using fossil fuel (natural gas) as its primary fuel rather than landfill-generated methane gas; and it had failed to file biannual and annual reports for years 1998 to 2001.

In response to the Commission's citation order, RTC filed a complaint for declaratory and injunctive relief seeking to enjoin the Commission's proceedings on the ground that the Commission's action was preempted by PURPA and federal regulations promulgated thereunder by FERC.  Specifically, RTC claimed that the Commission was invading the exclusive jurisdiction of FERC by attempting to determine if the Pontiac Facility was entitled to remain certified as a QF under PURPA.  RTC also sought a declaratory ruling on the preemption issue and summary judgment on its request for the declaratory ruling.

After hearing arguments from both sides and considering the presented briefs, the trial court granted the Commission's motion to dismiss the complaint and denied RTC's motion for summary judgment.  In arriving at its decision, the trial court stated that the "main issue raised is whether the Commission has the authority, as a matter of law, to make its own determination that facilities such as Pontiac meet and maintain the criteria of QSWEFs independent of any determination of concurrent federal certification."  The trial court reasoned that even though section 8-403.1(b) of the Retail Rate Law required a facility to, among other things, "possess characteristics" necessary to qualify as a QF under federal law before it could qualify as a QSWEF under state law,
(footnote: 3) this requirement did not invade the federal jurisdiction of FERC because the statute did not give the Commission the power to certify or decertify a facility as a QF under federal law.

The trial court determined that section 8-403.1(b) of the Retail Rate Law was not preempted by PURPA, but rather, was intended to work within the framework of PURPA.  RTC now appeals from the trial court's decision.

ANALYSIS

RTC first contends that the Commission's proposed proceeding to review whether the Pontiac Facility is in violation of FERC fuel usage regulations (
i.e.
, whether the facility was using natural gas as its primary fuel rather than landfill-generated methane gas) is preempted by PURPA and federal regulations promulgated thereunder by FERC.  Specifically, RTC claims that the Commission's review of the Pontiac Facility's QSWEF status based on alleged violation of FERC fuel usage regulations is preempted by PURPA because it would invade FERC's exclusive jurisdiction to determine a QF's fuel usage rate.
(footnote: 4)  We must reject RTC's contentions.

Pursuant to the supremacy clause of the United States Constitution (U.S. Const., art. VI, cl. 2), Congress has the authority to preempt state law. 
English v. General Electric Co.
, 496 U.S. 72, 78-79, 110 L. Ed. 2d 65, 74-75, 110 S. Ct. 2270, 2275 (1990).  In determining whether Congress has preempted state law, a reviewing court's task is to discern congressional intent. 
English, 
496 U.S. at 78-79, 110 L. Ed. 2d at 74, 110 S. Ct. at 2275.  This analysis begins with the assumption that Congress did not intend to displace state law. 
Maryland v. Louisiana
, 451 U.S. 725, 746, 68 L. Ed. 2d 576, 595, 101 S. Ct. 2114, 2129 (1981).  The question of whether a federal enactment preempts a state statute is a question of law subject to 
de novo
 review. 
Cress v. Recreation Services, Inc.
, 341 Ill. App. 3d 149, 173, 795 N.E.2d 817 (2003).

Under the supremacy clause, a federal enactment can preempt a state statute in three circumstances.  First, Congress can expressly state an intent to preempt state law (express preemption); second, intent to preempt may be reasonably inferred where federal regulation is so comprehensive that there is no room for supplementary state regulation or because the field is one in which the federal interest is so dominant that it displaces state regulation on the same subject (implied or field preemption); and third, state law is preempted to the extent that it actually conflicts with federal law (conflict preemption). 
English, 
496 U.S. at 78-79, 110 L. Ed. 2d at 74-75, 110 S. Ct. at 2275; 
Schneidewind v. ANR Pipeline Co.
, 485 U.S. 293, 299-300, 99 L. Ed. 2d 316, 325, 108 S. Ct. 1145, 1150 (1988).  Conflict preemption may occur where it is impossible for a private party to comply with both state and federal requirements or where the state regulation stands as an obstacle to fully achieving the federal objective. 
English, 
496 U.S. at 79, 110 L. Ed. 2d at 74-75, 110 S. Ct. at 2275; 
Schneidewind
, 485 U.S. at 300, 99 L. Ed. 2d 325, 108 S. Ct. 1150.

In the instant case, RTC asserts that the Commission's proposal to review the Pontiac Facility's QSWEF status based on alleged violation of FERC fuel usage regulations is preempted on conflict-preemption principles.  RTC contends that if the Commission is allowed to conduct such a review, it would undermine the policy and purposes of PURPA by invading FERC's exclusive jurisdiction to determine a facility's QF status as it relates to federal fuel usage rates.  RTC's contention is meritless.

There is no conflict between FERC's use of the federal fuel usage regulation in assessing the Pontiac Facility's status as a QF under federal law and the Commission's utilization of the same regulation in determining whether the facility should remain certified as a QSWEF under state law.  In the event the Pontiac Facility's QSWEF status is revoked under the Retail Rate Law and it is no longer eligible to receive a state-subsidized "retail rate," this determination would not interfere with the facility's designation as a QF under PURPA and would not affect the facility's right to continue receiving federal benefits in the form of "avoided cost rates."

The Commission is not attempting to determine whether the Pontiac Facility's fuel usage rate complies with federal law as it relates to the facility's status as a QF under PURPA.  Rather, the Commission is attempting to determine, 
inter alia
, whether the Pontiac Facility violated federal fuel usage rates, and if so, whether this violation prevents the facility from being recertified as a QSWEF under the State's Retail Rate Law.  In this regard, the Commission's review does not stand as an obstacle to the accomplishment and execution of FERC's objectives under PURPA.  Indeed, the Commission's proposed review furthers the federal objective of ensuring that certified facilities have a primary fuel source which is 75% biomass (
i.e.
, non-fossil-fuel organic matter), waste, renewable resources (
e.g.
, wind, solar or hydropower), geothermal resources, or a combination thereof. See 18 C.F.R. § 292.204(b)(1)(i) (2004).  RTC has not carried its burden of establishing that the Commission's proposed review is preempted by federal law.

RTC next contends that the statutory definition of "Qualified Solid Waste Energy Facility" (QSWEF), as set forth in the definitions section of the Illinois Administrative Code (Illinois Code) (83 Ill. Adm. Code § 445.20 (2003)), indicates that a facility's status as a QSWEF is "unequivocally" established when the facility files a valid FERC QF-certification with the Commission.  RTC claims that once a facility obtains a valid, FERC-issued QF-certification and afterwards files that QF- certification with the Commission and becomes certified as a QSWEF under the Illinois Code, any subsequent attempts by the Commission to reevaluate the facility's QSWEF status on alleged violations of federal fuel usage regulations runs afoul of the Commission's own regulations, since under the regulations a facility's status as a QF under FERC automatically establishes its status as a QSWEF under state law.  In addition, RTC maintains that nothing in the Commission's regulations allow or contemplate the Commission addressing the issue of FERC fuel usage regulations in reevaluating a facility's QSWEF status.  Again, we must reject RTC's contentions. 

Section 445.20 of Title 83 of the Illinois Code defines a QSWEF in relevant part as follows:

"'Qualified Solid Waste Energy Facility' (QSWEF) means a facility that meets the criteria set forth in 18 CFR 292
(footnote: 5) ***, and the Local Solid Waste Disposal Act ***, or an electric generating facility which uses methane gas generated from landfills and meets such requirements of 18 CFR 292." 83 Ill. Adm. Code § 445.20 (2003).

In turn, section 445.30 of Title 83 of the Illinois Code, entitled "Availability of Benefits," states in relevant part as follows:

"a) The benefits of this Part shall apply to any qualified solid waste energy facility.  The owner(s) or operator of such a facility shall petition the Commission for a determination that the facility meets the requirements and criteria specified in the Act
(footnote: 6) and this Part.  These requirements include complying with the procedures for obtaining qualifying status set forth in 18 CFR 292 and with the Local Solid Waste Disposal Act.

b) In demonstrating compliance with 18 CFR 292, the owner(s) or operator of a facility must file with the Commission a copy of:

1) the notice filed with [FERC] pursuant to 18 CFR 292.207, or

2) certification as a qualifying facility issued by the [FERC] or a successor agency." 83 Ill. Adm. Code §§ 445.30(a), (b)(1), (b)(2) (2003).

RTC argues that pursuant to section 445.30(b) of the Illinois Code, a facility can establish itself as a QSWEF simply by filing either a FERC-issued QF-certification with the Commission or a notice of application for such certification.  The problem with RTC's argument is that pursuant to section 445.30(a) of the Illinois Code, in order for a facility to receive state benefits under the Illinois statute, the facility must not only comply with 18 C.F.R. 292, it must also meet the requirements and criteria specified in the Illinois Public Utilities Act, which includes the Retail Rate Law.

Under section 8-403.1(b) of the Retail Rate Law, a QSWEF is defined as a facility that the Commission determines qualifies as a qualified solid waste energy facility under the Local Solid Waste Disposal Act; uses methane gas generated from landfills as its primary fuel; and possesses characteristics that enable it to qualify as a cogeneration or small power production facility under federal law. 220 ILCS 5/8-403.1(b) (West 2000).

Pursuant to the Illinois Public Utilities Act, the Commission has the authority to determine 
whether the Pontiac Facility's violation of federal fuel usage rates prevent the facility from being recertified as a QSWEF under the State's Retail Rate Law. See, 
e.g.
, 
Continental Mobile Telephone Co. v. Illinois Commerce Comm'n
, 269 Ill. App. 3d 161, 167, 645 N.E.2d 516 (1994) (Commission derives its authority from the Illinois Public Utilities Act); 
Local 777 v. Illinois Commerce Comm'n
, 45 Ill. 2d 527, 535, 260 N.E.2d 225 (1970) (Commission regulates all public utilities pursuant to the Illinois Public Utilities Act).

In sum, a facility's status as a QSWEF is not automatically established merely because the facility files a FERC QF-certification with the Commission or a notice of application for such certification.  In addition, even after a facility is certified as a QSWEF, the Commission has the authority under the Illinois Public Utilities Act to reevaluate whether the facility has continued to satisfy the requirements necessary to retain its status as a QSWEF.

Finally, RTC asserts that the trial court erred by relying on the statutory phrase "possesses characteristics," contained in section 8-403.1(b) of the Retail Rate Law, in finding that the Commission had the authority to reassess the Pontiac Facility's fuel usage rate.  We must reject RTC's argument.

In granting the Commission's motion to dismiss the complaint and denying RTC's motion for summary judgment, the trial court reasoned that even though section 8-403.1(b) of the Retail Rate Law required a facility to "possess characteristics" necessary to qualify as a QF under federal law before it could qualify as a QSWEF under state law, this requirement did not invade the federal jurisdiction of FERC because the Illinois statute did not give the Commission the power to certify or decertify a facility as a QF under federal law.  As set forth above, the trial court's analysis in this regard was correct.  The trial court did not err by utilizing the phrase "possesses characteristics" in its analysis.

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BURKE, P.J., and GARCIA, J., concur.

FOOTNOTES
1: In response to the nationwide energy crisis, Congress enacted PURPA in 1978 to encourage states to develop alternative energy sources, such as cogeneration and small power production facilities, in an effort to reduce this country's dependence on traditional fossil fuels. See 
Federal Energy Regulatory Comm'm v. Mississippi
, 456 U.S. 742, 72 L. Ed. 2d 532, 102 S. Ct. 2126 (1982); 
New York v. United States
, 505 U.S. 144, 161, 120 L. Ed. 2d 120, 141, 112 S. Ct. 2408, 2420 (1992); 
Independent Energy Producers Ass'n, Inc. v. California Public Utilities Comm'n
, 36 F.3d 848, 850 (9th Cir. 1994)
.

A "cogeneration facility" is a facility that produces both electric energy and steam or some other form of useful energy, such as heat. 16 U.S.C. § 796(18)(A) (2000).  A "small power production facility" is a facility that produces electric power from biomass, waste, renewable resources such as wind, water or solar energy, or geothermal resources, and has a production capacity of not more than 80 megawatts. 16 U.S.C. § 796(17)(A) (2000).  A cogeneration or small power production facility will be certified as a QF if it satisfies the requirements regarding ownership, size, fuel usage, efficiency, and reliability under PURPA. 16 U.S.C. §§ 796(17)(C), (18)(B) (2000).

The Federal Energy Regulatory Commission (FERC) exercises exclusive authority over QF status determinations under PURPA. See 
Independent Energy Producers Ass'n, 
36 F.3d at 853-54.  In an effort to encourage development of alternative energy sources and to overcome the reluctance of traditional utilities to buy from and sell to these alternative producers, Congress granted QFs certain benefits.  Under PURPA, QFs are exempt from certain regulatory controls and are assured a market by being given the right to interconnect with local public utilities and to receive favorable rates, prescribed by FERC, up to the full "avoided cost" of the utility. See 
American Paper Institute, Inc. v. American Electric Power Service Corp.
, 461 U.S. 402, 404-06, 76 L. Ed. 2d 22, 27-29, 103 S. Ct. 1921, 1923-25 (1983).

Section 210(a) of PURPA (16 U.S.C. § 824a-3(a) (2000)) directs FERC to promulgate rules requiring electric utilities such as Commonwealth Edison Company to offer to sell and purchase electric energy to and from QFs.  Pursuant to section 210(a) of PURPA, a utility in need of energy or capacity must offer to purchase from a cogenerator or small power producer that is a QF.  In turn, the QF may demand a price that is equal to, but not greater than, the utility's full "avoided cost." See 16 U.S.C. §824a-3(b) (2000); 18 C.F.R. §292.304(b)(2) (2000).  The "avoided cost" is the incremental cost the utility would have incurred by either generating the power itself or purchasing it from an alternative source other than a QF. 18 C.F.R. § 292.101(b)(6) (2000).

2: In 1987, the Illinois legislature adopted the Retail Rate Law to encourage the development of alternate energy production facilities. Pub. Act 85-882, § 3, eff. November 5, 1987 (adding Ill. Rev. Stat. 1987, Ch. 111 2/3, par. 8-403.1);
 see also 
New Heights Recovery & Power, LLC v. Bower
, 347 Ill. App. 3d 89, 92, 806 N.E.2d 1156 (2004).  The Retail Rate Law required traditional utility companies to enter into 20-year contracts to purchase electricity from QSWEFs at a "retail rate" that was generally higher than the "avoided cost" rate QFs were entitled to receive under federal law.  In return, the utility companies would receive tax credits from the State in an amount equal to the difference between the "retail rate" and "avoided cost rate." 220 ILCS 5/8-403.1(d) (West 2000); 
Resource Technology Corp. v. Commonwealth Edison Co., 
343 Ill. App. 3d 36, 39, 795 N.E.2d 936 (2003).  In 1996, the Retail Rate Law was amended to redefine a QSWEF as a facility that uses landfill-generated methane gas as its primary fuel. Pub. Act 89-448, § 5, eff. March 14, 1996.      

3: Under section 8-403.1(b) of the Retail Rate Law, a QSWEF is defined as a facility which the Commission determines qualifies as a qualified solid waste energy facility under the Local Solid Waste Disposal Act (415 ILCS 10/1 
et seq
. (West 2000)); uses methane gas generated from landfills as its primary fuel; and "possess[es] characteristics" which enable it to qualify as a cogeneration or small power production facility under federal law. 220 ILCS 5/8-403.1(b) (West 2000).

The Local Solid Waste Disposal Act defines a QSWEF as either "(i) a solid waste pollution control facility *** or (ii) a facility which uses methane gas generated from landfills." 415 ILCS 10/2(5) (West 2000).   

4: Under PURPA, a QF's use of fossil fuel (
i.e.
, coal, oil, or natural gas) "may not, in the aggregate, exceed 25 percent of the total energy input of the facility during the 12-month period beginning with the date the facility first produces electric energy and any calender year subsequent to the year in which the facility first produces electric energy." 18 C.F.R. § 292.204(b)(2) (2004) (the so-called 25% rule). See 
New Charleston Power I, LP v. Federal Energy Regulatory Comm'n
, 56 F.3d 1430, 1433 (D.C. Cir. 1995).  

5: Section 292.101 of the Code of Federal Regulations (CFR) defines a "QF" as follows:

"Qualifying facility means a cogeneration facility or a small power production facility that is a qualifying facility under Subpart B of this part." 18 C.F.R. § 292.101 (2000). 

6: "Act" is defined in the Illinois Code to mean the Illinois Public Utilities Act (which includes the Retail Rate Law) (220 ILCS 5/1-101 
et seq. 
(West 2000)). 83 Ill. Adm. Code § 445.20 (2004).