2014 IL App (1st) 130544

SECOND DIVISION

Nos. 1-13-0544, 1-13-0632, 1-13-0653, 1-13-1063, 1-13-1120
(Consolidated)

| | | |
|---|---|---|
| COMMONWEALTH EDISON COMPANY, | ) | Appeal from Order of |
| | ) | Illinois Commerce |
| Petitioner, | ) | Commission |
| | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS COMMERCE COMMISSION; AMEREN | ) | |
| ILLINOIS COMPANY; C3, INC.; COLATION OF | ) | |
| ENERGY SUPPLIERS (Interstate Gas Supply, Inc.; | ) | |
| MidAmerican Energy Company; and North American | ) | |
| Power and Gas, LLC); CONSTELLATION | ) | |
| NEWENERGY, INC.; ENVIRONMENTAL LAW AND | ) | |
| POLICY CENTER; EXELON GENERATION | ) | |
| COMPANY, LLC; FUTUREGEN INDUSTRIAL | ) | |
| ALLIANCE, INC.; ILLINOIS COALITION TO | ) | |
| ADVANCE RENEWABLE ENERGY (ACCIONA Energy | ) | |
| North America Corporation; EDP Renewables | ) | |
| North America LLC; Iberdrola Renewables, LLC; | ) | No. 1-12-0544 |
| Invenergy LLC; and NextEra Energy Resources, LLC); | ) | |
| ILLINOIS COMPETITIVE ENERGY ASSOCIATION | ) | |
| (Ameren Energy Marketing Company; Champion | ) | |
| Energy, LLC; Constellation NewEnergy, Inc.; Direct | ) | |
| Energy Services, LLC; Exelon Energy Company; Integrys | ) | |
| Energy Services, Inc.; MC Squared Energy Services, LLC; | ) | |
| FirstEnergy Solutions Corporation; Nordic Energy | ) | |
| Services, LLC; and Reliant); ILLINOIS INDUSTRIAL | ) | |
| ENERGY CONSUMERS; ILLINOIS POWER AGENCY; | ) | |
| NATIONAL RESOURCES DEFENSE COUNCIL; | ) | |
| RETAIL ENERGY SUPPLY ASSOCIATION (Champion | ) | |
| Energy Services, LLC; ConEdison Solutions; Constellation | ) | |
| NewEnergy, Inc.; Direct Energy Services, LLC; | ) | |
| Energetix, Inc.; Energy Plus Holdings, LLC; Exelon | ) | |
| Energy Company; GDF Suez Energy Resources NA, Inc.; | ) | |
| Green Mountain Energy Company; Hess Corporation; | ) | |
| Integrys Energy Services, Inc.; Just Energy; Liberty Power; | ) | |
| MC Squared Energy Services, LLC; Mint Energy LLC; | ) | |
| NextEra Energy Services; Noble American Energy | ) | |
| Solutions LLC; PPL EnergyPlus, LLC; Reliant; Stream | ) | |
| Energy; TransCanada Power Marketing Ltd.; and | ) | |

Nos. 1-13-0544, 1-13-0632, 1-13-0653, 1-13-1063, 1-13-1120
(Consolidated)

TriEagle Energy, L.P.); WIND ON THE WIRES, )
 )
  Respondents. )

   PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.
   Justice Pierce concurred in the judgment and opinion.
   Justice Pucinski dissented, with opinion.

## OPINION

¶ 1 Petitioner Commonwealth Edison Company (ComEd), Illinois Competitive Energy Association (ICEA), and Illinois Industrial Energy Consumers (IIEC) appeal the order of the Illinois Commerce Commission (Commission) that requires ComEd to enter into a sourcing agreement to procure electricity for the retail customers of alternative retail electric suppliers (ARES) and recoup the costs through a "competitively neutral" charge.   On appeal, appellants contend that the Commission violated section 16-111.5 of the Public Utilities Act (220 ILCS 5/16-111.5 (West 2012)) when it ordered ComEd to enter into a sourcing agreement to procure electricity for customers other than its own "eligible retail customers" and rendered its decision without substantial support from the record.

¶ 2         JURISDICTION

¶ 3 The Commission issued its final order on December 19, 2012.   ComEd filed a timely application for rehearing on January 22, 2013, and a joint motion for clarification of the final order.   On January 29, 2013, the Commission denied the application for rehearing but granted the motion for clarification and, on the same day, issued an amendatory order.   On February 22, 2013, ComEd filed a notice of appeal.   Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 335(a) governing direct review of administrative orders by the appellate court.   Ill. S. Ct. R. 335(a) (eff. Feb. 1, 1994).

- 2 -

¶ 4                                              BACKGROUND

¶ 5        Under the Public Utilities Act, article XVI (titled Electric Service Customer Choice and Rate Relief Law of 1997) (Rate Relief Law) sought to restructure the electricity industry in order to create competition and introduce customer choice in the supply of electricity. 220 ILCS 5/16-101A(b) (West 2012). Prior to the passage of this article, electric utilities like ComEd both sold electricity to customers and delivered that electricity through its distribution network. Article XVI separated the two components so that ARES could now compete with one another to sell electricity to consumers. 220 ILCS 5/16-115 (West 2012). Before an ARES can serve any retail customer, it must first obtain a certificate of service authority from the Commission in accordance with section 16-115. As part of its certification, subsection (d)(5) requires an ARES applicant to source some electricity from clean coal facilities, and further provides that "the required sourcing of electricity generated by clean coal facilities, other than the initial clean coal facility,[1] shall be limited to the amount of electricity that can be procured or sourced at a price at or below the benchmarks *** in accordance with item (1) of subsection (c) and items (1) and (5) of subsection (d) of Section 1-75 of the Illinois Power Agency Act." 220 ILCS 5/16-115(d)(5)(iii) (West 2012). ComEd, however, remains responsible for delivering electricity to ARES customers over its distribution network. 220 ILCS 5/16-108 (West 2012).

¶ 6        Article XVI also requires ComEd to continue supplying electricity to residential and small commercial customers within their service territory who have not chosen an ARES and who purchase power from the utility "under fixed-price bundled service tariffs." 220 ILCS

---

[1]The parties agree that an initial clean coal facility has never been established by the legislature and therefore the statutory provisions dealing with the initial clean coal facility are not relevant in this appeal.

5/16-111.5(a) (West 2012). The statute refers to these customers as "eligible retail customers." *Id*. To guide ComEd's procurement of electricity, the General Assembly passed the Illinois Power Agency Act (20 ILCS 3855/1-5(1) (West 2012)), which created the Illinois Power Agency (IPA). The IPA has the powers and duties enumerated in the Illinois Power Agency Act. 20 ILCS 3855/1-15(a) (West 2012).

¶ 7     The goal of the Illinois Power Agency Act is to protect "[t]he health, welfare, and prosperity of all Illinois citizens" in the "provision of adequate, reliable, affordable, efficient, and environmentally sustainable electric services at the lowest total cost over time." 20 ILCS 3855/1-5(1) (West 2012). To accomplish this goal, the General Assembly declared it "necessary to improve the process of procuring electricity to serve Illinois residents, to promote investment in energy efficiency ***, and to support development of clean coal technologies and renewable resources." 20 ILCS 3855/1-5(4) (West 2012). The legislature established that by January 1, 2025, "25% of the electricity used in the State shall be generated by cost-effective clean coal facilities." 20 ILCS 3855/1-75(d)(1) (West 2012). It also determined that "[p]rocuring a diverse electricity supply portfolio will ensure the lowest total cost over time for adequate, reliable, efficient, and environmentally sustainable electric service." 20 ILCS 3855/1-5(5) (West 2012).

¶ 8     Pursuant to the Illinois Power Agency Act, the Illinois Power Agency is tasked with procuring electricity for ComEd and Ameren Illinois Company (Ameren).[2] To this end, the Illinois Power Agency develops annual electricity procurement plans for the utilities and submits the plans for final approval by the Commission. 220 ILCS 5/16-111.5(b) (West 2012) ("[a]

---

[2]Ameren is not a party to this consolidated appeal.

procurement plan shall be prepared for each electric utility consistent with the applicable requirements of the Illinois Power Agency Act"). Relevant to this appeal, the clean coal portfolio standard contained in the Illinois Power Agency Act states that the IPA's "procurement plans shall include electricity generated using clean coal." 20 ILCS 3855/1-75(d) (West 2012).

¶ 9 On September 28, 2013, the Illinois Power Agency filed a proposed procurement plan with the Commission. The plan required ComEd and ARES to enter into sourcing agreements with FutureGen 2.0, a project of the FutureGen Industrial Alliance, Inc. (FutureGen Alliance). The FutureGen Alliance is a nonprofit corporation "formed to create the world's first coal-fueled, near-zero emissions electric power plant." The FutureGen 2.0 project consists of the retrofitting of Ameren's facility in Meredosia, Illinois, to utilize clean-coal technology. The Illinois Power Agency determined that the utilities and ARES should purchase the facility's output in an amount consistent with their proportional share, or in a "competitively neutral" manner.

¶ 10 The Commission found that, pursuant to section 1-75(d)(5) of the Illinois Power Agency Act, it had the authority to compel both the utilities and ARES to enter into sourcing agreements with retrofitted clean coal facilities approved by the Commission. However, Commission staff expressed concern that, given the number of ARES involved (approximately 70), requiring each ARES to enter into a sourcing agreement with FutureGen 2.0 would present an administrative burden.[3] The staff suggested an alternate approach whereby FutureGen 2.0 would contract only with ComEd and Ameren, and each utility would purchase FutureGen 2.0 power for its own eligible retail customers as well as the retail customers of ARES. The utilities would then

---

[3] The majority of customers in ComEd's service territory receive their electricity from ARES, not ComEd.

recover the additional costs through a competitively neutral charge assessed to ARES' customers for their share of the output.

¶ 11    On December 19, 2012, the Commission issued its final order approving the Illinois Power Agency's procurement plan, but modified the plan to reflect the staff's alternate approach regarding sourcing agreements with FutureGen 2.0.    It concluded that the staff's proposal was "quite reasonable in light of the administrative burden that would be placed on FutureGen, the Commission, Staff and ARES if a separate sourcing agreement were required for each and every ARES as well as ComEd and Ameren."    *Scott*, Ill. Commerce Comm'n Order 12-0544 (Dec. 19, 2012).    The Commission found that while sections 1-75(d)(5) of the Illinois Power Agency Act and 16-115 of the Public Utilities Act did not explicitly sanction the alternate approach, "the intent of the Legislature that all customers equally bear the costs and benefits of the State's clean coal portfolio standard is consistent with the alternative proposal."    *Id*.    Upon a motion for clarification, the Commission entered an amendatory order on January 29, 2013, stating that under the alternate approach, ComEd would be able to recover its costs incurred under the FutureGen 2.0 sourcing agreement through a competitively neutral charge that is not a delivery services charge.    *Scott*, Ill. Commerce Comm'n Amendatory Order (Jan. 29, 2013).    After denial of the petitions for rehearing filed on January 29, 2013, ComEd, ICEA, and IIEC initiated this action for administrative review.    This court consolidated the appeals.

¶ 12                                        ANALYSIS

¶ 13    Initially, we address a preliminary issue raised by the Commission.    The Commission contends that this court should disregard and strike the brief of Coalition of Energy Suppliers (CES), and to strike portions of ComEd's brief in response to ICEA/IIEC's appellant brief.    It

argues that CES is an appellee, but CES's brief attacks the Commission's order. The Commission contends that if CES seeks reversal or modification of the order, it must file its own appeal or cross-appeal. The Commission also argues that this court should strike the portion of ComEd's response brief raising the dormant commerce clause argument, because ComEd did not present the issue as a ground for error in its application for rehearing as required, nor did it raise the issue in its main brief. The striking of a brief, in whole or in part, is a harsh sanction and is proper only in cases where the alleged violations interfere with or preclude our review. *In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005). This consolidated appeal involves numerous parties presenting, and responding to, arguments on complex issues regarding the regulation of the electricity industry. The fact that this court ordered a specific briefing schedule, pursuant to an agreement by the parties, underscores the unique nature of this appeal. The briefs before us sufficiently set forth the issues, and we find that the alleged violations identified by the Commission do not preclude meaningful review of the merits of this case. Therefore, in the exercise of our discretion, we deny the Commission's request to strike and will address the arguments briefed in this appeal. *Id*.

¶ 14 On appeal, ComEd and ICEA/IIEC challenge the Commission's order. Courts give substantial deference to the Commission's decisions for it is an administrative body with expertise in the area of public utilities, and thus is qualified to interpret highly technical evidence. *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 12 (1994). The Commission's findings are considered *prima facie* reasonable and the burden of proof is on the appellant on all issues raised in the appeal. 220 ILCS 5/10-201(d) (West 2012). In reviewing the Commission's orders, a court is limited to determining whether (1) the Commission acted

within its authority; (2) it made adequate findings to support its decision; (3) substantial evidence supports its decision; and (4) any constitutional rights were violated. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 322 Ill. App. 3d 846, 849 (2001).

¶ 15 ComEd and ICEA/IIEC contend that the Commission's approval of the procurement plan, which compels ComEd to enter into a sourcing agreement with FutureGen 2.0 on behalf of ARES, exceeded its statutory authority. The scope of the Commission's authority is a question of law, which we review *de novo*. *City of Chicago v. Illinois Commerce Comm'n*, 294 Ill. App. 3d 129, 134-35 (1997).

¶ 16 An administrative agency derives its authority to act solely from the statute creating the agency. *Resource Technology Corp. v. Commonwealth Edison Co.*, 343 Ill. App. 3d 36, 44 (2003). Therefore, the issue before this court is one involving statutory interpretation. In interpreting a statute, a court's primary objective is to ascertain and give effect to legislative intent as indicated by the plain and ordinary meaning of the statutory language. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 328 Ill. App. 3d 937, 942 (2002). However, courts appreciate an agency's experience and expertise in a given area and therefore will give substantial deference to its interpretation of an ambiguous statute it administers and enforces. *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152-53 (1983). While not binding on the courts, an agency's interpretations are an informed source for ascertaining the legislature's intent in enacting the statute. *Id*. at 153.

¶ 17 In construing a statute, courts must "ascertain and give effect to the overall intent of the drafters." *Knolls Condominium Ass'n v. Harms*, 202 Ill. 2d 450, 458 (2002). The Rate Relief Law of the Public Utilities Act sought to restructure the electricity industry so as to create

competition and introduce customer choice in the supply of electricity. 220 ILCS 5/16-101A(b) (West 2012). Accordingly, section 16-111.5(a) of the Public Utilities Act sets forth ComEd's procurement of electricity for its customers. It states that an electric utility "shall procure power and energy for its eligible retail customers in accordance with the applicable provisions set forth in Section 1-75 of the Illinois Power Agency Act and this Section." 220 ILCS 5/16-111.5(a) (2012). "Those customers that are excluded from the definition of 'eligible retail customers' shall not be included in the procurement plan load requirements ***." *Id*. The Rate Relief Law further provides that utilities shall procure power pursuant to procurement plans approved by the Commission. 220 ILCS 5/16-111.5(b) (West 2012).

¶ 18 Section 1-75 of the Illinois Power Agency Act grants the Illinois Power Agency authority to "develop procurement plans and conduct competitive procurement processes in accordance with the requirements of Section 16-111.5 of the Public Utilities Act for the eligible retail customers of electric utilities." 20 ILCS 3855/1-75(a) (West 2012). It also sets forth specific provisions relating to the procurement plan requirements. Relevant to this appeal, section 1-75(d)(1) provides that such procurement plans "shall include electricity generated using clean coal." 20 ILCS 3855/1-75(d)(1) (West 2012). This section is referred to as the clean coal portfolio standard.

¶ 19 Section 1-75(d)(5) provides that the Illinois Power Agency shall also "consider sourcing agreements covering electricity generated by power plants" previously owned by Illinois utilities "that have been or will be converted into clean coal facilities." 20 ILCS 3855/1-75(d)(5) (West 2012). As part of the procurement planning process, owners of these retrofitted facilities "may propose to the [Illinois Power] Agency sourcing agreements with utilities and alternative retail

electric suppliers required to comply with subsection (d) of this Section and item (5) of subsection (d) of Section 16-115 of the Public Utilities Act." *Id*.

¶ 20    The legislature included a corresponding clean coal electricity requirement in the certification of ARES.    Before servicing any customer in Illinois, an ARES "must obtain a certificate of service authority from the Commission in accordance with this Section."    220 ILCS 5/16-115(a) (West 2012).    As part of the certification process, an ARES applicant must source some of its electricity from clean coal facilities including retrofitted facilities.    220 ILCS 5/16-115(d)(5)(iii) (West 2012).    This section provides:

"(d) The Commission shall grant the application for a certificate of service authority if it makes the findings set forth in this subsection based on the verified application and such other information as the applicant may submit:

* * *

(5) That the applicant will procure renewable energy resources in accordance with Section 16-115D of this Act, and will source electricity from clean coal facilities as defined in Section 1-10 of the [Illinois Power Agency Act] in amounts at least equal to the percentages set forth in subsections (c) and (d) of Section 1-75 of the [Illinois Power Agency Act.]    For purposes of this Section:

* * *

(iii) the required sourcing of electricity generated by clean coal facilities, other than the initial clean coal facility, shall be limited to the amount of electricity that can be procured or sourced at a price at or below the benchmarks approved by the Commission each year in accordance with

item (1) of subsection (c) and items (1) and (5) of subsection (d) of the Illinois Power Agency Act[.]"   220 ILCS 5/16-115(d)(5)(iii) (West 2012).

¶ 21   Appellants agree that these statutory provisions allow the Illinois Power Agency to develop a procurement plan that compels ComEd to enter a sourcing agreement with a retrofitted clean coal facility on behalf of ComEd's eligible retail customers.   However, they argue for a strict reading of the statutory provisions.   ComEd and ICEA/IIEC contend that the plain words of the procurement plan provisions of the Rate Relief Law and the Illinois Power Agency Act refer only to ComEd's eligible retail customers, which by definition excludes ARES customers. Therefore, the IPA has no power to propose, and the Commission has no power to approve, procurement plans requiring ComEd to procure electricity for ARES customers.   At most, the Commission can compel each ARES to enter into a sourcing agreement with FutureGen 2.0, but it cannot compel ComEd to enter such agreements on behalf of ARES.

¶ 22   We disagree.   While the general statutory provisions relating to procurement plans for utilities refer only to ComEd's eligible retail customers, the specific provisions setting forth ComEd's required procurement of electricity from retrofitted clean coal sources make no mention of eligible retail customers.   We will not place undue emphasis on the statutory construction rule that the inclusion of one term necessarily excludes other possible terms.   See *Knolls*, 202 Ill. 2d at 459.   Instead, courts must construe statutes relating to the same subject with reference to one another in order to give effect to all the provisions if possible.   *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 392 (1998).   If it appears a conflict exists between the statutes, courts will try to construe the provisions harmoniously.   *United Citizens of Chicago & Illinois*

*v. Coalition to Let the People Decide in 1989*, 125 Ill. 2d 332, 339 (1988). The intent of the legislature is most significant. *Id.* at 338-39.

¶ 23 The legislature clearly found the use of electricity generated by clean coal facilities important for both utilities and ARES. Both parties must utilize such electricity in their supply to customers, and when the electricity comes from retrofitted clean coal facilities, procurement by utilities and ARES must meet the same benchmarks set forth in section 1-75(d)(5). This legislative intent is reflected in the clean coal portfolio standard which, by its terms, grants the Illinois Power Agency and the Commission more authority in the procurement of electricity from such sources. See *Knolls*, 202 Ill. 2d at 459 (where both a general statutory provision and a specific statutory provision address the same subject, "the specific provision controls and should be applied").

¶ 24 The question is whether these provisions authorize the Illinois Power Agency to compel ARES to enter into a sourcing agreement with FutureGen 2.0. ICEA/IIEC argue that the statutes grant no such authority. The statutory procurement planning process, after all, is aimed at the utilities and not at ARES. Also, the statutes do not expressly state that ARES can be compelled to enter into a sourcing agreement with a retrofitted clean coal facility.

¶ 25 However, as part of the certification process ARES must source electricity from clean coal facilities in amounts at least equal to those set forth in section 1-75(c)(1) and (d)(5) of the Illinois Power Agency Act. Subsection (d)(5) provides that pursuant to the procurement planning process, owners of qualified retrofitted clean coal facilities "may propose to the [Illinois Power] Agency sourcing agreements with utilities *and alternative retail electric suppliers* required to comply with" subsection (d) and section 16-115(d)(5) of the Public Utilities Act.

(Emphasis added.) 20 ILCS 3855/1-75(d)(5) (West 2012). The statute clearly contemplates, at the very least, that the Illinois Power Agency can consider such sourcing agreements with ARES in the procurement planning process. If the Illinois Power Agency can consider such agreements, it is reasonable to presume that the Illinois Power Agency can compel ARES to enter into sourcing agreements with such facilities as part of the procurement planning process if doing so furthers statutory goals. The Commission contends that it has such authority where compelling ARES to enter into sourcing agreements with retrofitted clean coal facilities furthers the goals of supporting the development of clean coal technologies, and providing electricity at the lowest total cost. We acknowledge the Commission's experience and expertise in this area and give substantial deference to its interpretation of an ambiguous statute it administers and enforces. *Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 152-53.

¶ 26 The Commission, however, adopted the alternate approach suggested by its staff. The alternate approach requires only ComEd and Ameren to enter into sourcing agreements with FutureGen 2.0 to purchase a pro rata share of the output based on the amount of electricity the utilities deliver to its distribution customers (including ARES customers). ComEd and Ameren then could recover the costs associated with procurement through a competitively neutral charge assessed to all of their retail distribution customers (including ARES customers). The Commission reasoned that this approach was a cost-effective alternative to the burdensome process of administering and monitoring approximately 70 individual sourcing agreements.

¶ 27 We find that the Commission acted within its statutory authority. Pursuant to the Rate Relief Law of the Public Utilities Act and the Illinois Power Agency Act, both the utilities and ARES must source some of their electricity from clean coal or retrofitted facilities. As

discussed above, the Commission has the authority to compel both the utilities and ARES to enter into sourcing agreements with retrofitted clean coal facilities as part of the procurement planning process. Viewed within this framework, the Commission's order approving a procurement plan requiring ComEd to enter a sourcing agreement with FutureGen 2.0 on behalf of ARES customers, while not explicitly condoned by statute, is within its "inherent authority and wide latitude to adopt regulations or policies reasonably necessary to perform the agency's statutory dut[y]." (Internal quotation marks omitted.) *Resource Technology Corp. v. Commonwealth Edison Co.*, 343 Ill. App. 3d 36, 44 (2003).

¶ 28 ComEd argues, however, that even if the Commission has authority to approve the alternate approach, it failed to support its finding with substantial evidence that the approach was necessary to avoid administrative burdens on the parties. Upon review, courts consider the Commission's factual findings *prima facie* true and its orders *prima facie* reasonable. *United Cities Gas Co.*, 163 Ill. 2d at 11. Furthermore, the Commission need not provide findings on each evidentiary claim; it is sufficient if the findings are specific enough for courts to review the order. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2013 IL App (2d) 120334, ¶ 38. Substantial evidence is evidence that a reasoning mind finds sufficient to support a finding. *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 479 (1994). Substantial evidence is more than a mere scintilla, but need not rise to the level of a preponderance of the evidence. *Commonwealth Edison Co.*, 2013 IL App (2d) 120334, ¶ 38. A party who argues that the Commission's findings were not supported by substantial evidence must show more than the mere fact that the evidence supports a different

conclusion. Instead, the party must show that the opposite conclusion was clearly evident. *Abbott Laboratories, Inc. v. Illinois Commerce Comm'n*, 289 Ill. App. 3d 705, 714 (1997).

¶ 29 The parties agreed to proceed before the Commission without hearings and addressed any issues by filing verified responses to comments and objections, and by filing replies. The Commission's staff contended that requiring the Illinois Power Agency to negotiate separate sourcing agreements with an estimated 70 separate ARES, as well as with ComEd and Ameren, would be burdensome. Specifically, the staff determined that the utilities would bear the costs of providing FutureGen with billing records for each customer served by ARES, ARES and FutureGen would bear costs associated with entering into and managing 70 additional contracts, and the staff would need to devote extra time to review all of the annual reports of compliance with the clean coal portfolio standard by each party and to ensure compliance with the standard by each ARES. In support of its position, the staff presented affidavits of the following staff members: Diana Hathhorn (accountant in the Commission's financial analysis division), Jennifer L. Hinman (economic analyst in the Commission's policy division), Rochelle Phipps (senior financial analyst in the financial analysis division), and Jim Zolnierek (director of the policy division). The affidavits stated that the witness had personal knowledge of the facts and matters discussed in the response and objections, and to the best of their knowledge, information, and belief, the facts and nonlegal opinions expressed are accurate and true.

¶ 30 ComEd, however, complains that the Commission did not support its findings with substantial evidence because it "did not attempt to quantify or analyze in any systematic way the burdens" on the parties, nor did it adequately consider the burdens placed on ComEd. ComEd provides no authority for its position that the Commission must provide quantifiable findings on

each evidentiary claim. It is self-evident that the administration of several sourcing agreements is overall less burdensome than the administration and monitoring of more than 70 agreements. Affidavits from Commission staff support that conclusion. We find the evidence sufficient to support the Commission's decision. Furthermore, ComEd does not show that the opposite conclusion is clearly evident. It argues only that the Commission made no finding that the administrative burdens avoided by the alternate approach outweigh the administrative burdens the approach imposes on ComEd.

¶ 31 Pursuant to the Public Utilities Act, the Commission "should act to promote the development of an effectively competitive electricity market that operates efficiently and is equitable to all consumers." 220 ILCS 5/16-101A(d) (West 2012). By adopting the alternate approach, which presented a more streamlined administration of the clean coal portfolio standard required of the utilities and ARES, the Commission properly exercised its authority to formulate reasonable means of achieving legislative objectives. We find the Commission's order approving the alternate approach lawful and supported by substantial evidence.

¶ 32 ICEA/IIEC make an additional argument that the Commission has no authority to impose a competitively neutral charge, that is not a delivery service charge, upon ARES customers. ComEd disagrees, arguing that if the Commission has authority to compel utilities to procure electricity from retrofitted clean coal facilities for ARES customers, ComEd should recover the costs associated with that procurement. As discussed above, the Commission's authority to compel ComEd to enter into a sourcing agreement with FutureGen 2.0 derives from the Illinois Power Agency's authority to develop a procurement plan for utilities that comply with the clean coal portfolio standard of the Illinois Power Agency Act. See 20 ILCS

3855/1-75(d) (West 2012). Subsection (d)(6) states that "[c]osts incurred under this subsection (d) or pursuant to a contract entered into under this subsection (d) shall be deemed prudently incurred and reasonable in amount and the electric utility shall be entitled to full cost recovery pursuant to the tariffs filed with the Commission." 20 ILCS 3855/1-75(d)(6) (West 2012). Allowing ComEd to recover these costs from ARES customers further promotes the legislature's intent to allocate the costs of supplying utility services "to those who cause the costs to be incurred." 220 ILCS 5/1-102(d)(iii) (West 2012). Therefore, according to the plain terms of the statute, ComEd is entitled to recover from ARES customers its costs of entering into the sourcing agreement with FutureGen 2.0 on ARES' behalf.

¶ 33 ComEd and ICEA/IIEC also argue that the Commission's order violates the dormant commerce clause and is therefore unconstitutional. This negative component of the commerce clause prohibits states from enacting regulatory measures designed to benefit in-state interests at the expense of out-of-state competitors. *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273-74 (1988). In other words, "state statutes that clearly discriminate against interstate commerce are routinely struck down [citations], unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Id*. at 274.

¶ 34 Appellants argue that the Commission's order is unconstitutional because it requires ComEd to enter into a sourcing agreement for clean-coal energy with FutureGen 2.0, an Illinois facility, effectively excluding from consideration out-of-state clean electric sources. They allege that the order also has a discriminatory effect because 70% of the rate cap imposed on ComEd for clean coal electricity is devoted to FutureGen 2.0's output, "leaving little room for any [other competitors] to place their clean coal electricity on the Illinois market." The order

thus prevents customers from obtaining less costly clean coal electricity procured from out-of-state sources, in violation of the dormant commerce clause.

¶ 35    Before addressing these constitutional arguments on the merits, however, we first determine whether ICEA/IIEC and ComEd have standing to challenge the constitutionality of the statute.    The doctrine of standing "ensure[s] that courts are deciding actual, specific controversies, and not abstract questions or moot issues."    *In re Marriage of Rodriguez*, 131 Ill. 2d 273, 279-80 (1989).    Generally, courts will not consider a constitutional challenge to a statutory provision unless the party challenging it is directly affected by the provision.    *In re M.I.*, 2013 IL 113776 ¶ 32.    In other words, the party challenging the provision "must be directly or materially affected by the attacked provision and must be in immediate danger of sustaining a direct injury" from the statute's enforcement.    *Id*.    Without evidence of facts showing such injury, a party does not have standing to challenge the statutory provision on the ground that it would be unconstitutional if applied to third parties in a hypothetical case.    *Id*.

¶ 36    The Commission argues that ICEA/IIEC and ComEd have not shown "any evidence of discrimination on any similarly situated clean coal facility."    On the issue of standing to challenge this provision, however, the relevant question is whether ICEA/IIEC and/or ComEd is "directly or materially affected by the attacked provision" and "in immediate danger of sustaining a direct injury" from enforcement of the provision.    See *In re M.I.*, 2013 IL 113776, ¶ 32.    In their briefs, both parties acknowledge that the injured parties directly affected by the provision are out-of-state facilities that would compete against FutureGen 2.0 in the production of clean-coal electricity.    See also *Alliance for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995) (for the purpose of standing to challenge a statute that subsidized the use of Illinois coal

over the use of western coal, the relevant injury is the inability "to compete on an equal footing in interstate commerce"). Neither ICEA/IIEC or ComEd claim an interest in producing clean coal electricity. Furthermore, neither party has shown a direct, material injury that would result from enforcement of the provision. In fact, the Commission has not had the opportunity to enforce the provision since the FutureGen 2.0 facility is not yet operable. Therefore, we find that ICEA/IIEC and ComEd do not have standing to challenge the constitutionality of the provision at this time and, accordingly, we decline to address the issue here.

¶ 37    For the foregoing reasons, we affirm the order of the Commission.

¶ 38    Affirmed.


¶ 39    JUSTICE PUCINSKI, dissenting.

¶ 40    With great respect, I dissent from the opinion of the majority.

¶ 41    This is a one-word/one-phrase case. Some one-word cases require the court to determine what the legislature meant by a word that is undefined. *Local Union Nos. 15, 51 & 702 v. Illinois Commerce Commission*, 331 Ill. App. 3d 607 (5th Dist. 2002), is a good example. There the court, looking at the Public Utilities Act, had to decide whether the word "if" meant: " 'in the event that' " or " 'on the condition that.' " *Id.* at 614-15. Either use led to dramatically different results. More recently, and more famously, the court has been required to decide what the words " 'reside in' " mean in the Municipal Code and the Election Code. *Maksym v. Board of Election Commissioners Illinois*, 242 Ill. 2d 303, 324 (2011). Some other one-word cases call on us to decide what a missing word means. That is, whether we should insert it, as though it was an oversight by the legislature to have left it out, or leave the language of the statute as written, and consider that the legislature had a purpose in leaving the word out when they passed it.

¶ 42    Here the statute in question is the Illinois Power Agency Act (20 ILCS 3855/1-75 (d)(5) (West 2012):

(5) [Sentence 1] Re-powering and retrofitting coal-fired power plants previously owned by Illinois utilities to qualify as clean coal facilities.    [Sentence 2] During the 2009 procurement planning process and thereafter, the Agency and the Commission *shall consider* sourcing agreements covering electricity generated by power plants that were previously owned by Illinois utilities and that have been or will be converted into clean coal facilities, as defined by Section 1-10 of this Act.  [Sentence 3] Pursuant to such procurement planning process, the owners of such facilities *may* propose to the Agency sourcing agreements with *utilities and alternative retail electric suppliers* required to comply with subsection (d) of this Section and item (5) of subsection (d) of Section 16-115 of the Public Utilities Act, covering electricity generated by such facilities.   [Sentence 4] In the case of sourcing agreements that are power purchase agreements, the contract price for electricity sales shall be established on a cost of service basis.  [Sentence 5]  In the case of sourcing agreements that are contract, for differences, the contract price from which the reference price is subtracted shall be established on a cost of service basis. [Sentence 6] The Agency and the Commission  *may* approve any such *utility* sourcing agreements that do not exceed cost-based benchmarks developed by the procurement administrator, in consultation with the Commission staff, Agency staff and the procurement monitor, subject to Commission review and approval."   (Emphases added.)

¶ 43    Under the plain language of sentence 2 above it is clear that FutureGen 2.0 qualifies under this section since it is a retrofitted coal fired power plant previously owned by an Illinois utility, in

this case Ameren.   And, with all the federal money (about $1.5 billion) coming into the state to develop FutureGen 2.0's new technology, along with the dedicated property, equipment and plant in Meriposa, Illinois, and the pipeline and storage/sequestration facility for the carbon dioxide at the Mt. Sinai formation in Morgan County, it is clear that the state's policy makers have decided that FutureGen 2.0 qualifies – at least in theory – as a clean coal facility as defined by section 1-10 of the Illinois Power Agency Act.   Of course it is not up and running yet and will not be until 2017, and then the energy it produces will be more expensive than other clean coal facility energy, because our legislature has also decided that "all coal used by a clean coal facility shall have high volatile bituminous rank and greater than 1.7 pounds of sulfur per million btu content," a restriction which favors Illinois coal.   20 ILCS 3855/1-10 (West 2012).   Further, the record and statements at oral argument make it clear that FutureGen 2.0 cannot even continue its development without the sourcing agreements at issue in place because without a guaranteed revenue stream – these sourcing agreements – it cannot attract future investment in the project.

¶ 44     Sentence 3 mandates the Illinois Power Agency and the Commission "shall" consider sourcing agreements from such plants, and since FutureGen 2.0 is the only one like it,   it is pretty clear that the Illinois Power Agency and the Commission shall at least give sourcing agreements with FutureGen 2.0 some consideration, but note the statute does not *require* that the sourcing agreement be accepted, just that it shall be *considered,* the kind of waffling that leaves all the discretion to the Illinois Power Agency and the Commission, and neatly takes the legislature off the hook in case someone complains that just maybe this is a restraint of trade issue.

¶ 45     Sentence 4 gives the owners of the facilities, in this case FutureGen 2.0, the opportunity to *propose* sourcing agreements to the Illinois Power Agency for both utilities and ARES, but only

the opportunity to propose the agreements, not any guarantee that the sourcing agreements must be accepted.

¶ 46    The rub comes at sentence 6 which says the "Agency and the Commission may approve such *utility* sourcing agreements" but totally ignores whether the Illinois Power Agency and the Commission may also approve such sourcing agreements for ARES.   (Emphasis added.) 20 ILCS 3855/1-75(d)(5) (West 2012).

¶ 47    The FutureGen 2.0 and Commission briefs want us to insert the phrase: "and alternative retail electric suppliers" to sentence 6, so that it would read:   the "Agency and the Commission may approve such utility *and alternative retail electric suppliers* sourcing agreements." (Emphasis added.)

¶ 48    Clearly the Illinois Power Agency staff thinks so too, or they wouldn't have proposed the FutureGen 2.0 sourcing agreements for ARES, but adding those words has a complicated result in that it frustrates the reason the legislature passed another statute, the Rate Relief Law, which at section 16-101A(d) calls on the Commission to "act to promote the development of an effectively competitive electricity market that operates efficiently and is equitable to all consumers thereby committing this state to a system that is both equitable and competitive. "    220 ILCS 5/16-101A(d) (West 2012).

¶ 49    While it is true that the plan approved by the Commission is equitable to all customers in the sense that every customer of every electricity supplier in Illinois will share in the higher cost of the FutureGen 2.0 electricity, so the burden is spread around, that is because only clean coal facilities that burn the kind of coal we have in abundance in Illinois qualify as clean coal suppliers to either utilities or ARES.   Coincidentally, FutureGen 2.0 is the only one in existence anywhere

identified in the record that burns that kind of coal.

¶ 50    However, it is also true that the FutureGen 2.0 energy will be more expensive than other clean coal facility electricity that is generated without the particular problems associated with Illinois coal thus frustrating the competitive purpose of the Customer Choice Act.

¶ 51    All of this is further complicated by the approval by the Commission of the Illinois Power Agency's staff recommendation to require ComEd and Ameren (not a party to this appeal) to actually do the sourcing agreements on behalf of all ARES.   ComEd reasonably wonders under what authority the Commission requires it, a regulated utility, to enter into contracts on behalf of private sector ARES, even though the Commission has neatly provided a way for ComEd to recoup its costs of doing so.

¶ 52    The Commission says it can do this because it has the authority to do those things necessary to implement its mandates.   However, the Commission has not provided any statute to this court demonstrating that there is a mandate, that it has the authority, or that the state has a public policy to guarantee 100% of FutureGen 2.0's output for the next 20 years in noncompetitive contracts, let alone by ComEd for the benefit of ARES customers.

¶ 53    I would reverse the order of the Commission and let the legislature work to make sure that all the interrelated, overlapping and conflicting laws and public policies are reconciled.

¶ 54    As an alternative, and as suggested by the Illinois Power Agency, the Commission should at the very least engage in its rulemaking process to fully develop the set of rules that would permit this level of regulatory agency sleight-of-hand.

COMMONWEALTH EDISON COMPANY,

Petitioner,

v.

ILLINOIS COMMERCE COMMISSION; AMEREN ILLINOIS COMPANY;
C3, INC.; COLATION OF ENERGY SUPPLIERS (Interstate Gas Supply, Inc.;
MidAmerican Energy Company; And North American Power and Gas, LLC);
CONSTELLATION NEWENERGY, INC.; ENVIRONMENTAL LAW AND
POLICY CENTER; EXELON GENERATION COMPANY, LLC;
FUTUREGEN INDUSTRIAL ALLIANCE, INC.; ILLINOIS COALITION TO
ADVANCE RENEWABLE ENERGY (ACCIONA Energy North America
Corporation; EDP Renewables North America LLC; Iberdrola Renewables, LLC;
Invenergy LLC; and NextEra Energy Resources, LLC); ILLINOIS COMPETITIVE
ENERGY ASSOCIATION (Ameren Energy Marketing Company; Champion
Energy, LLC; Constellation NewEnergy, Inc.; Direct Energy Services, LLC;
Exelon Energy Company; Integrys Energy Services, Inc.; MC Squared Energy
Services, LLC; FirstEnergy Solutions Corporation; Nordic Energy Services, LLC;
and Reliant); ILLINOIS INDUSTRIAL ENERGY CONSUMERS; ILLINOIS
POWER AGENCY; NATIONAL RESOURCES DEFENSE COUNCIL;
RETAIL ENERGY SUPPLY ASSOCIATION (Champion Energy Services, LLC;
ConEdison Solutions; Constellation NewEnergy, Inc.; Direct Energy Services, LLC;
Energetix, Inc.; Energy Plus Holdings, LLC; Exelon Energy Company; GDF Suez
Energy Resources NA, Inc.; Green Mountain Energy Company; Hess Corporation;
Integrys Energy Services, Inc.; Just Energy; Liberty Power; MC Squared Energy
Services, LLC; Mint Energy LLC; NextEra Energy Services; Noble American
Energy Solutions LLC; PPL EnergyPlus, LLC; Reliant; Stream Energy; TransCanada
Power Marketing Ltd.; and TriEagle Energy, L.P.); WIND ON THE WIRES,

Respondents.

Nos. 1-13-0544, 1-13-0632, 1-13-0653, 1-13-1063 & 1-13-1120   (Consolidated)

Appellate Court of Illinois
First District, Second Division

July 22, 2014

PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justice Pierce concurred in the judgment and opinion.
Justice Pucinski dissented, with opinion.

Appeal from the Order of the

Illinois Commerce Commission.

Rooney Rippie & Ratnaswamy LLP, 350 West Hubbard Street, Suite 600, Chicago, IL 60654, (E. Glenn Rippie, of counsel), for APPELLANT.

Jenner & Block LLP, 1099 New York Avenue NW, Suite 900, Washington, DC 20001, (David W. Debruin and Matthew E. Price, of counsel), for APPELLANT.

Jenner & Block LLP, 353 North Clark Street, Chicago, IL 60654, (Barry Levenstam and Irina Dmitrieva, of counsel), for APPELLANT.


Shefsky & Froelich Ltd., 111 East Wacker Drive, Suite 2800, Chicago, IL 60601, (John F. Kennedy, Jonathan B. Amarillo, Barton J. O'Brien, Rachel L. Schaller and Cary E. Donham, of counsel), for APPELLEE.

Lueders Robertson and Konzen LLC, P.O. Box 735, 1939 Delmar Avenue, Granite City, IL 62040, (Eric Robertson, Ryan Robertson and Drew Rankin, of counsel), for APPELLEE.

Illinois Commerce Commission, Office of General Counsel, 160 North LaSalle Street, Suite C-800, Chicago, IL 60601, (John P. Kelliher, James E. Weging and Thomas R. Stanton, of counsel), for APPELLEE.

Quarles & Brady LLP, 300 North LaSalle Street, Suite 4000, Chicago, IL 60654, (Christopher J. Townsend, Christopher N. Skey and Adam T. Margolin, of counsel), for APPELLEE.

Law Offices of Gerald T. Fox, Two Prudential Plaza, 180 North Stetson Street, Suite 3500, Chicago, IL 60601, (Gerald T. Fox, of counsel), for APPELLEE.

Husch Blackwell LLP, 120 South Riverside Plaza, Suite 2200, Chicago, IL 60606, (Douglas F. McMeyer, of counsel), for APPELLEE.

Husch Blackwell LLP, 190 Carondelet Plaza, Suite 600, St. Louis, MO 63105, (Kyle C. Barry and JoAnn T. Sandifer, of counsel), for APPELLEE.


Office of Illinois Attorney General Lisa Madigan, Civil Appeals Division, 100 West Randolph Street, 12th Floor, Chicago, IL 60601 (Clifford W. Berlow, of counsel), for APPELLEE.

Citizens Utility Board, 309 West Washington Street, Suite 800, Chicago, IL 60606 (Julie Soderman and Orijit Ghoshal, of counsel), for APPELLEE.